MADELEINE M. LANDRIEU, Judge.
11 Aaron Mercadel allegedly accepted money from five individuals to perform home construction/repairs/renovation work. Due to his alleged failure to complete this work, he was charged by bill of information with five counts of theft of U.S. currency valued at $500.00 or more, violations of Louisiana Revised Statute 14:76, and one count of issuing a worthless check in the amount of $1,032.50, a violation of Louisiana Revised Statute 14:71. Prior to trial, the court severed Counts One and Six from the remaining counts and proceeded to trial on four counts of theft over $500.00. Following a judge trial, the court convicted Mr. Mercadel of two of the counts and acquitted him of two of the counts. The trial court sentenced Mr. Mercadel to six years at hard labor on each count, to run concurrently with each other.
Subsequently, Mr. Mercadel pleaded guilty to Counts One (theft over $500.00) and Six (issuing a worthless check) and was sentenced to six years at hard labor on each of these counts, to run concurrently with the sentences imposed for the other convictions. He was then adjudicated a second-felony habitual offender on Count Two. The trial court vacated the original sentence and 12resentenced him as a second-felony offender on this count to six years at hard labor, to rim concurrently with the other three counts.
Mr. Mercadel’s counsel filed an appeal for a review of the record for errors patent and filed a motion to withdraw pursuant to Anders v. California, 886 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).
Mr. Mercadel filed a pro se appeal asserting insufficiency of evidence, the failure of the trial judge to recuse himself from the trial, the right to conflict-free representation, and ineffective assistance of counsel. For the reasons that follow, we grant appellate counsel’s motion to withdraw and affirm the judgment of the trial court.
FACTS
The trial court conducted a judge trial on Counts Two, Three, Four, and Five. Each of the victims alleged that they paid money to Mr. Mercadel to perform home construction/repair/renovation work to their respective homes. They all contend that he did not complete the work he was hired to perform, that much of the work he did perform was substandard and had to be redone, and that he took money from them with the intent to deprive them of it permanently. As the court found Mr. Mercadel guilty only on Counts Two and Four, we will address the facts pertinent to these counts.
Count Two — Gloria Jackson
Gloria M. Jackson, then age seventy-four, testified that due to damage from Hurricane Katrina her home located at 1538 Tricou Street had to be torn down. She contracted with Mr. Mercadel to build a new home for $50,000. Ms. Jackson testified that she wrote two checks to Mr. Mercadel, one for $20,000 and one for $6,000. She testified that Mr. Mercadel told her that the $26,000 would go toward I.Jabor and materials, that this amount was roughly half the price of the contract, and that it was what he needed to start the job. Ms. Jackson testified that Mr. Mercadel applied for building permits and that he *876 applied for a bench mark certifícate. However, the foundation for the home was never finished, and the home was never constructed. Ms. Jackson identified photographs of what her property looked like when Mr. Mercadel ceased construction.
Ms. Jackson confirmed that she was in continuous communication with Mr. Mer-cadel, because “I was constantly calling him.” Ms. Jackson recorded some of her telephone conversations with Mr. Mercadel which were played for the jury. Ms. Jackson stated that she tried to get Mr. Merca-del to perform the work beginning in 2007 up until the time of trial in 2010. She said that after Mr. Mercadel failed to fulfill his promise to complete the work, she requested that he return her money beginning in 2008. She testified that he agreed to do so, but never did. She testified that she even told him he could repay her in “parts.” He agreed to give her $5,000. She said he then told her he could only come up with $2,000, which she agreed to accept and wait for the remaining $3,000. However, she testified that he never repaid her any money.
Ms. Jackson lodged a complaint with the Louisiana Department of Justice. Mr. Mercadel purportedly responded to the complaint with a letter “written on behalf of Mr. Mercadel from ‘My Three Sons.’ ” In the letter Mr. Mercadel said he had made numerous attempts to give her back her money. The letter also stated that he did not believe that he could do the remaining work required in the house for the amount of the contract. The letter also stated that he would return $19,420 to her. Ms. Jackson testified that Mr. Mercadel owed her more than that amount and that the allegations in the letter were not true.
|4Mr. Mercadel testified in his own behalf. He testified that he was fifty-four years old and had been doing construction work since he was eighteen or nineteen years old. Mr. Mercadel said that he was quite experienced in giving bids on properties, estimating that he had been doing it for fifteen years when he entered into the contracts at issue in the instant case. Mr. Mercadel admitted that he previously pleaded guilty to simple burglary; to issuing worthless checks; and to misapplication of contractor payments.
As to Gloria Jackson’s residence, he testified that he applied for a building permit, obtained architectural drawings, and obtained a bench mark and elevation certificate from a surveying company. He produced a receipt for a load of dirt for the project and a diagram of the foundation for the home. He said there was no “re-bar” for the foundation on the construction site because when the government announced $30,000 grants to elevate homes in the area the cost of steel, concrete and other materials skyrocketed. Also, he testified that when he took the architectural drawings to a lumber yard the quote for the cost of the materials for the rough framing of the residence — not including electrical, plumbing, insulation, roofing materials, etc. — was $49,860.
He stated that because a lot of heavy equipment in the area had been lost to Hurricane Katrina, he was unable to find a bucket to dig the chain wall space according to the specs he was using. He hired five workers to manually dig it at a cost of $100 per day per worker and that this cost ate him up financially. Mr. Mercadel stated that due to the weather and this necessity of manual labor, it took him three months to dig the trench for the chain wall and foundation for Ms. Jackson’s home. He stated that he had to clear up a surveying problem with the property at City Hall which added another two months to his time delays.
|5He admitted that Ms. Jackson gave him a $20,000 deposit, and that he spent *877 almost $16,000 immediately. He said that Ms. Jackson did give him another $6,000, but she refused to give him any more money after that until he completed more work. He said she did not understand that he could not build the home’s foundation and the home itself for $26,000. Although the contract called for $50,000, he stated that she did not understand that he needed more money to complete the job.
Mr. Mercadel testified that in response to a letter from the State Licensing Board stating that he could be penalized up to $2,500 if he did not act on Ms. Jackson’s complaint within five days, he wrote the letter to the Louisiana Department of Justice offering to repay $19,420. He denied at trial that he owed Ms. Jackson that amount, reiterating that he had spent almost $16,000. He said he was going to give Ms. Jackson $19,420 just to satisfy her. He never returned any money to Ms. Jackson.
Mr. Mercadel testified that he stopped working on Ms. Jackson’s house when she said she could not give him any more money. He said he explained to her that he was looking at $28,000 for the foundation work and almost $50,000 on rough materials to rough-frame the house. He told her he would try to get money from another program, but he was never able to do so.[1]
Count Four — Kim Castle
Kim Castle, then living in Murfreesboro, North Carolina, testified that she owned a residence at 1405 Aubry Street in New Orleans that was devastated by Hurricane Katrina. She testified that she and Mr. Mercadel were friends from | r,childhood and that she trusted him. Ms. Castle ran into him and mentioned that she was looking for a contractor to renovate this rental property. He told her that he was a contractor working on million dollar homes. They entered into a contract and she gave him a check for $15,000. Ultimately, she gave Mr. Mercadel and his company, “My Three Sons,” a total of $38,000.
Ms. Castle testified that Mr. Mercadel telephoned her in North Carolina about an opportunity he had to purchase an air conditioning unit for $3,500, telling her he needed the money right away. She testified that she sent a check for $3,000 to Mr. Mercadel by next-day-delivery-mail and told him that she would be in New Orleans the next week to give him the remaining $500 upon seeing that the air conditioning unit had been installed. The next week she drove to New Orleans and discovered that there was no air conditioning unit on site and was unable to locate Mr. Merca-del. She said that Mr. Mercadel told her that he would return the $3,000 to her but never did. Ultimately, she had to hire another contractor to install an air conditioning unit.
Ms. Castle testified that Mr. Mercadel telephoned her “maybe two and a half years later” and told her that her residence was almost finished; that he had installed the bottom cabinets in the residence; and that the residence looked beautiful. She again came to New Orleans and discovered that he had not installed any cabinets.
Over the years, Ms. Castle testified that Mr. Mercadel gave her numerous reasons why he did not finish the work. Once, he told her that he could not get a work permit because FEMA had stopped giving permits. On another occasion, he told her that someone in his family died. Another excuse was that some of his workers had *878 hangovers. Another time, he told her that he would be able to |7purchase materials and proceed with repairing her residence, when he received money owed to him by others.
Ms. Castle confirmed that Mr. Mercadel did complete some of the work called for in the contract including replacing windows, rewiring the house, removing a bay window, reworking doorways, replacing 10% of damaged weatherboards, replacing fence boards, installing insulation, installing a bathtub, and spraying the ceilings. However, Mr. Mercadel did not perform some of the work until two years after they entered into the contract. Additionally, although he did replace sections of sheetrock, she did not know whether he replaced the termite damage within these walls as required by the contract. She stated that some of the work he did not complete included replacing damaged flooring, installing new plumbing fixtures, replacing 90% of damaged weatherboards, and installing an electrical box. She agreed that Mr. Mercadel performed some work which was not included in the contract and that he should get credit for this work.
In Mr. Mercadel’s testimony, he confirmed that Ms. Castle paid him $35,000 and gave him an additional $8,000 for the air conditioning unit. He claims to have completed $30,000 worth of work on the home and justified the other $5,000 as additional work performed outside of the terms of the contract. He testified that he had to rewire the house a second time after someone broke into Ms. Castle’s home and ripped wiring out of the house and that Ms. Castle told him she would get money from her insurance company for this work. He said that the rewiring was not included in the contract and that he charged Ms. Castle $3,500 for it. He said he performed other work for the remaining $1,500, including insulation, sheetrock, painting the entire house, carpeting, ceramic tile, and installing a tub.
| RAlthough Mr. Mercadel admitted that installation of the cabinets was provided for by the contract, they were not installed because he had exceeded his budget by wiring her house twice and installing insulation and sheetrock in the house. Instead, he offered to install the cabinets if Ms. Castle purchases them herself. He also testified that due to termite damage he had to replace all of the weatherboards on the front of the house and reframe the entire front wall.
Mr. Mercadel testified that Ms. Castle told him to forget about the air conditioning unit. He claims that she wanted him to remove a large tree that had fallen from her back yard onto her neighbor’s property instead. He said that pursuant to a verbal agreement between them the $3,000 was compensation for removing the large fallen tree.
MOTION TO WITHDRAW AS COUNSEL
Appellate counsel assigns as Mr. Merca-del’s sole assignment of error a request for a review of the record for patent errors. Counsel complied with the procedures outlined by Anders v. California, supra, as interpreted by this court in State v. Benjamin, 573 So.2d 528 (La.App. 4th Cir.1990). Counsel filed a brief complying with State v. Jyles, 96-2669 (La.12/12/97), 704 So.2d 241. Counsel’s detailed review of the procedural history of the case and the facts of the case indicate a thorough review of the record. Counsel found no trial court ruling that arguably supports the appeal. Counsel moved to withdraw because he believes, after a conscientious review of the record, that there is no non-frivolous issue for appeal. A copy of counsel’s brief was forwarded to Mr. Mercadel, and this court informed him that he had the right *879 to file a brief in his own behalf. Mr. Mercadel subsequently filed a pro se brief raising four assignments of error.
TERRORS PATENT
A review of the record for errors patent reveals none. See, La.C.Cr. P. art. 920(2). Appellate counsel’s motion to withdraw is granted.
PRO SE ASSIGNMENTS OF ERROR
Mr. Mercadel raises the following assignments of error:
1. The evidence was insufficient to sustain his convictions for theft of $500.00 or more.
2. The trial judge committed reversible error in failing to recuse himself from the ease because of an alleged familial relationship with defense counsel.
3. The trial judge committed reversible error in failing to inform Mr. Merca-del of his right to conflict-free representation “subsequently to acknowledging his nephew’s enrollment in the instant cause of action, and prior to any and all further criminal proceedings.”
4. He received ineffective assistance of counsel.
SUFFICIENCY OF EVIDENCE
By this assignment of error, Mr. Mercadel asserts that the evidence presented at trial was insufficient to support his convictions for theft of $500.00 or more. When issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Hearold, 603 So.2d 731, 734 (La.1992); State v. Marcantel, 2000-1629, p. 8 (La.4/3/02), 815 So.2d 50, 55. Therefore, this assignment of error will be considered first.
The standard of review for the sufficiency of the evidence is whether, viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that the State proved the essential elements beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817, 820 (La.1987). The testimony of a |insingle witness, if believed by the trier of fact, is sufficient to support a conviction. State v. Wells, 2010-1338, p. 5 (La.App. 4 Cir. 3/30/11), 64 So.3d 303, 306. A factfinder’s decision concerning the credibility of a witness will not be disturbed unless it is clearly contrary to the evidence. State v. James, 2009-1188, p. 4 (La.App. 4 Cir. 2/24/10), 32 So.3d 993, 996.
Mr. Mercadel was convicted in Count Two of theft of U.S. currency valued in an amount of $500 or more from Gloria Jackson, with the intent to permanently deprive her of that property, and in Count Four of theft of U.S. currency valued in an amount of $500 or more from Kim Castle, with the intent to permanently deprive her of that property, both violations of La. R.S. 14:67(A).
The crime of theft is defined by Louisiana Revised Statute 14:67(A), which provides in pertinent part:
A. Theft is the misappropriation or . taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.
Theft is a specific intent crime. The specific intent factor of the offense relates to permanently depriving the own *880 er of whatever may be the subject of the misappropriation or taking. Specific intent is defined as “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” State v. Alvey, 2002-1741, pp. 6-7 (La.App. 4 Cir. 1/29/03), 839 So.2d 395, 400; La. R.S. 14:10(1); State v. Scott, 99-0241, p. 7 (La.App. 4 Cir. 1/5/00), 752 So.2d 255, 258-259. Specific intent need not be proven as fact, but may be inferred from the circumstances and actions of the defendant. State v. Hebert, 2000-1052, p. 12 (La.App. 4 Cir. 4/11/01), 787 So.2d 1041, 1050, writ denied, 2001-1804 (La.3/15/02), 811 So.2d 905.
Count Two — Gloria Jackson
In this count, Ms. Jackson and Mr. Mercadel agree that they entered into a contract whereby Mr. Mercadel was to rebuild Ms. Jackson’s home for $50,000. They also agree that Ms. Jackson gave Mr. Mercadel two checks totaling $26,000. It is undisputed that Mr. Mercadel, despite having secured the building permit, paying for architectural drawings, consulting with Ms. Jackson on the design of the residence, and beginning to construct a chain wall foundation for the home, never even completed the foundation for that building.
Mr. Mercadel contends that after beginning the work, he explained to Ms. Jackson that it would cost $28,000 for the foundation work and almost $50,000 on material to rough-frame the house. He gave no estimate as to how much it would cost for electrical, plumbing, insulation, roofing materials, and other work, on top of the $78,000 actual construction costs for the foundation and rough-framing of the residence. Mr. Mercadel testified that he stopped working on Ms. Jackson’s home when she refused to give him any more money. Mr. Mercadel admits that it took him approximately three months to perform the work that he actually completed, and that Ms. Jackson sought a return of money she gave him because he was not timely completing the work. Ms. Jackson testified that Mr. Mercadel agreed to return some money to her but never did.
Although Mr. Mercadel testified at trial that he wrote a letter to the Louisiana Department of Justice admitting that he “owed” Ms. Jackson $19,420, he denied that he actually owed her that amount. He stated that he spent almost $16,000 of the money she gave him. He never accounted for the remainder.
112Mr. Mercadel contends that the State failed to prove his intent to permanently deprive Ms. Jackson of the money. He argues that the State had to prove he had the specific intent to permanently deprive Ms. Jackson of $500 or more at the time he received the two checks totaling $26,000 from her, which was in a less-than-two-week period in late June 2007.
However, in State v. Langford, 483 So.2d 979, 985 (La.1986), the court stated that even one who takes another’s property intending only to use it temporarily before restoring it to its owner may nevertheless be guilty of larceny if he later changes his mind and decides not to return the property after all. Considering this principle set forth in Langford and the circumstances of the instant case, that Mr. Mercadel might have formed the specific intent to permanently deprive Ms. Jackson of U.S. currency valued in the amount of $500 or more at some point after receiving the two checks from her does not render the evidence insufficient to support his conviction. The evidence clearly establishes that Mr. Mercadel never returned any of the $26,000 to Ms. Jackson, even though, he admitted that he had only spent some $16,000 of it on construction costs at *881 the point when she sought return of her money.
Viewing all the evidence in a light most favorable to the prosecution, a rational trier of fact could have concluded that, at the very least, Mr. Mercadel failed to repay Ms. Jackson a sum as small as $500 of the $26,000 she gave him as partial payment to construct her home, and thus found beyond a reasonable doubt that Mr. Merca-del misappropriated or took from Gloria Jackson U.S. currency valued at $500 or more, with the specific intent to deprive her of that currency.
There is no merit to this assignment of error.
113Count Four — Kim Castle
In Ms. Castle’s case, the trial court specifically found Mr. Mercadel guilty of theft of the $3,000 Ms. Castle gave him expressly for the purpose of purchasing an air conditioning unit to install in her home. This was outside of the contract between the two parties for the renovation of Ms. Castle’s home. The evidence established that Mr. Mercadel performed considerable work on Ms. Castle’s home pursuant to the original contract.
Mr. Jackson’s testimony about Mr. Mer-cadel’s request for a specific amount of money for an air-conditioning unit was very explicit. Testimony established that she sent him $8,000 and agreed to pay the remainder upon proof of installation. Upon arrival in New Orleans, she discovered that Mr. Mercadel was nowhere to be found and that the air conditioning unit was not even on the site, much less installed.
Mr. Mercadel testified that Ms. Castle told him to forget about the air conditioning unit, and that she wanted him to remove a large tree that had fallen from her back yard onto her neighbor’s property. He testified that she told him she would get an air conditioning unit from someone else at a cheaper price. Mr. Mercadel said his men cut up and removed the fallen tree and that he also completed the back fence. He said he considered the $3,000 as compensation for removing the large fallen tree. He said he performed this work pursuant to a verbal agreement.
The trial court expressly stated that he found Mr. Mercadel’s credibility lacking and expressly convicted defendant for theft of the $3,000 given to him by Ms. Castle for the air conditioning unit. Viewing all the evidence in a light most favorable to the prosecution, a rational trier of fact could have found beyond a | ^reasonable doubt that Mr. Mercadel misappropriated or took from Kim Castle U.S. currency valued in the amount of $500 or more, with the specific intent to deprive her of that currency.
There is no merit to this assignment of error.
RECUSAL AND CONFLICT-FREE REPRESENTATION
Because Mr. Mercadel’s arguments on these two assignments of error are essentially the same, we will consider them together. In these assignments, Mr. Merca-del asserts claims based on his supposition that his trial counsel, Clifton Stoutz, was the nephew of the trial court judge presiding over his case. Mr. Mercadel contends that the trial judge should have recused himself on his own motion pursuant to Louisiana Code of Criminal Procedure articles 671(A)(2) and 672 given this relationship.
First, any motion to recuse a trial judge must be brought, at the latest, prior to verdict or judgment. La.C.Cr.P. art. 674. No such motion was brought in this case and the issue was not raised in the trial court. As the issue is being raised for the first time here, it is untimely and *882 can be dismissed as such. Recognizing however Mr. Mercadel’s claim that his counsel was ineffective and that he had a right to “conflict-free counsel,” we will address his recusal arguments.
Second, there is nothing in the record to support the allegation that trial counsel Clifton Stoutz is the nephew of Judge Marullo. Even if he was, the Code of Criminal Procedure does not require or warrant recusal in this instance. Assuming Mr. Stoutz is Judge Marullo’s nephew, whether by consanguinity (blood) or affinity (marriage), that relationship would be in the third degree.[2] [ ^Louisiana Code of Criminal Procedure article 671(A)(2) requires recusal when the judge is related to an attorney employed in the cause within the second degree.
The only other grounds for recusal which could possibly exist here are found in Louisiana Code of Criminal Procedure article 671(A)(1) and (6) and Canon C(S) of the Code of Judicial Conduct. These provisions require recusal when the judge is biased, prejudiced, or personally interested in the cause to such an extent that he would be unable to conduct a fair and impartial trial; unable to conduct a fair and impartial trial for any reason at all; or when his impartiality might reasonably be questioned. Nothing in the record reflects any bias, prejudice or impartiality on the part of the trial judge in this case. The record further reflects that the trial judge conducted himself in a fair and impartial manner throughout these proceedings.
There is no merit to these assignments of error.
INEFFECTIVE ASSISTANCE OF COUNSEL
In this assignment of error, Mr. Merca-del argues that his counsel was ineffective for a number of reasons:
• an alleged conflict of interest presented by the alleged familial relationship between the trial judge and Mr. Mer-cadel’s trial counsel and Mr. Merca-del’s right to conflict-free representation
• an alleged predetermined intent of trial counsel to have Mr. Mercadel plead guilty to the two counts remaining following trial
• allowing the trial to go forward as a bench trial over Mr. Mercadel’s objection
• the court’s predetermined guilt of Mr. Mercadel prior to trial
• failure of trial counsel to file for a post-verdict judgment of acquittal
• allowing Mr. Mercadel to plead guilty to two of the charged counts
• failing to object to the habitual offender bill of information
• failing to inform Mr. Mercadel of discussions at bench conferences and rulings by the court
|](iA claim of ineffective assistance of counsel is generally relegated to post-conviction proceedings, unless the record permits definitive resolution on appeal. State v. Miller, 99-0192, p. 24 (La.9/6/00), 776 So.2d 396, 411, cert. denied, Miller v. Louisiana, 531 U.S. 1194, 121 S.Ct. 1196, 149 L.Ed.2d 111 (2001); State v. Seiss, 428 So.2d 444, 449 (La.1983). Ineffective assistance of counsel claims are reviewed under the two-part test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). State v. Rubens, 2010-1114, pp. 58-59 (La.App. 4 Cir. 11/30/11), 83 So.3d 30, 66-67, writ denied, 2012-0374 (La.5/25/12), 90 So.3d 410, writ denied, State ex rel. Rubens v. State, 2012-0399 (La.10/12/12), 99 So.3d 37, cert. de *883 nied, Rubens v. Louisiana, - U.S. -, 133 S.Ct. 1595, 185 L.Ed.2d 591 (2013).
In Rubens, this Court discussed the Strickland two-part test relating to an ineffective assistance of counsel claim stating that the defendant must show that counsel’s performance was deficient and that the deficiency prejudiced the defendant. Counsel’s performance is ineffective when it can be shown that he made errors so serious that counsel was not functioning as the “counsel” guaranteed to the defendant by the Sixth Amendment. Strickland, 466 U.S. at 687, 104 S.Ct. at 2064. Counsel’s deficient performance will have prejudiced the defendant if he shows that the errors were so serious as to deprive him of a fair trial. To carry his burden, the defendant “must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 694, 104 S.Ct. at 2068. The defendant must make both showings to prove that counsel was so ineffective as to require reversal. State v. Miller, 2000-0218, p. 7 (La.App. 4 Cir. 7/25/01), 792 So.2d 104, 111; State v. Sparrow, 612 So.2d 191, 199 (La.App. 4th Cir.1992).
Mr. Mercadel first argues that his counsel’s performance was deficient in allowing the criminal proceedings to continue despite his alleged familial relationship with the trial judge. Mr. Mercadel further argues that his counsel failed to inform him of his right to “conflict-free representation.” As determined earlier in this opinion, even assuming the existence of such relationship, there was no necessity for recusal in this case. See La.C.Cr.P. art. 671(A)(2). Furthermore, the record does not reflect any deficient representation by trial counsel or conflict with the trial judge that can be attributed to such relationship. There is no merit to the ineffective assistance of counsel argument as to this claim.
Mr. Mercadel next argues that defense counsel’s performance was deficient when he “consulted with judge on predetermined [sic] isx [sic] (6) years [sic] sentence, indicating circumstantial evidence [sic] plea of guilty had always been counsel’s intention.” This argument relates to the two guilty pleas Mr. Mercadel entered as to Counts One and Six, for which he received sentences of six years at hard labor on each count, to run concurrently with the concurrent six-year sentences he received on his convictions in Counts Two and Four. The fact that defense counsel negotiated guilty pleas in Counts One and Six and respective six-year sentences, to run concurrently with the six-year sentences imposed for the convictions in Counts Two and Four, does not indicate that a plea of guilty had “always” been defense counsel’s intention.
Also, Mr. Mercadel does not argue that his sentences of six years on each of the two offenses to which he pleaded guilty were excessive. Each offense to which Mr. Mercadel pleaded guilty — Count One being theft of U.S. currency valued in an 11samount of $500 or more, and Count Six being the issuance of a worthless check in the amount of $1,032.50, violations of Louisiana Revised Statute 14:67(A) and Louisiana Revised Statute 14:71, respectively— provided, at the time the offenses were committed, for a sentence of imprisonment with or without hard labor of not more than ten years. Mr. Mercadel has failed to show that the plea agreements constituted deficient representation or prejudiced him in any way. Thus, there is no merit to his claim of ineffective assistance of counsel as to this claim.
Mr. Mercadel’s third alleged instance of ineffective assistance of counsel was de *884 fense counsel “allowing a bench trial” over his objection. Mr. Mercadel fails to show evidence that he objected to a bench trial. As a matter of fact, when the trial court emphatically directed him to make a decision as to whether he wanted a trial by judge or jury, the record reflects that Mr. Mercadel made an informed and voluntary choice of a judge trial after twice conferring with his trial counsel. There is no merit to this claim.
Mr. Mercadel asserts in this argument that pretrial proceedings allegedly indicated the trial court’s “predetermined judgment of guilty as charged.” Nothing in the record supports this statement. During a motion hearing involving Count Five, the theft count involving Francis Cambridge, the trial court engaged in a colloquy with Mr. Mercadel regarding his ability to repay money to this victim. As to Count Five, the trial court ultimately adjudicated Mr. Mercadel not guilty. The trial court also found Mr. Mercadel not guilty as to Count Three. Therefore, while the trial judge spoke very matter-of-factly to Mr. Mercadel about his ability to make repayment to the victims, the record does not reflect that the trial judge showed any partiality when it came to judging his guilt or innocence at trial. |19There is no merit to the argument that defense counsel’s performance was deficient in proceeding to a judge trial on Counts Two, Three, Four, & Five.
Mr. Mercadel next argues that defense counsel was deficient in failing to file a motion for a post-verdict judgment of acquittal pursuant to Louisiana Code of Criminal Procedure article 821. Mr. Mer-cadel alleges that the prosecution failed to prove that he possessed the requisite specific intent to deprive the victims in Counts Two and Four permanently of the U.S. currency in question. The issue of whether the evidence was sufficient to prove beyond a reasonable doubt that Mr. Mer-cadel possessed the specific intent to permanently deprive these victims of U.S. currency valued in the amount of $500 or more was discussed in Mr. Mercadel’s first pro se assignment of error, as to sufficiency of the evidence. Thus, the issue of whether or not defense counsel should have filed a motion for post-verdict judgment of acquittal to raise that sufficiency of the evidence issue in the trial court is moot. Mr. Mercadel fails to show he was prejudiced by defense counsel not filing a motion for post-verdict judgment of acquittal.
Defendant next argues that defense counsel’s performance was deficient in permitting him to plead guilty “when there were [sic] no setting of factual basis to constitute [sic] element of [sic] crime charged.” However, the trial court conducted a pretrial probable cause hearing as to these charges. At this hearing, testimony by investigators from the Orleans Parish District Attorney’s Office, one an active police officer, the other a retired police officer, set forth a factual basis for the two counts to which Mr. Mercadel pleaded guilty. See State v. Massey, 2012-0928, pp. 2-3 (La.App. 4 Cir. 12/5/12), 106 So.3d 644, 645-646 (pretrial motion hearing testimony of police officer set forth factual basis for the defendant’s guilty plea).
|2qAs to Count One, Retired New Orleans Police Officer Mason Spong, also an investigator with the Orleans Parish District Attorney’s Office, testified at the probable cause hearing, involving the theft of U.S. currency valued in an amount of $500 or more from Emory White. Mr. Spong, a licensed insurance adjuster, was qualified by the trial court as an expert in that field. Mr. Spong testified that he investigated the alleged theft in this count. He testified that Ms. White paid Mr. Mer- *885 cadel approximately $5,500 to do remodeling and renovation work on her home. Mr. Spong said Mr. Mercadel was paid to wire Ms. White’s home, flush out her plumbing, replace and repair any pipes— gas or water — and obtain permits for the work. Mr. Spong testified that the only work performed by Mr. Mercadel was the wiring of Ms. White’s home, and he said that was done improperly.
Mr. Spong testified that there had been an oral agreement between Mr. Mercadel and Ms. White. He identified copies of three checks written by Ms. White to Mr. Mercadel, totaling $5,500. Mr. Spong estimated that the value of the services actually rendered would have been approximately $1,500 rather than the $5,500 paid. He also noted that a lot of that work had to be redone. He conservatively estimated that $3,500 worth of work remained to be done. His testimony established probable cause for the charge of theft in that Mr. Merca-del failed to render services valued at over $500.
As to Count Six, issuing a worthless check to Cajun Concrete, New Orleans Police Department Detective Michael Kitchens, assigned as an investigator with the Orleans Parish District Attorney’s Office Economic Crime Unit, testified that he received a copy of a check Mr. Mercadel allegedly wrote to Cajun Concrete, as charged in the bill of information, and a copy of Mr. Mercadel’s driver’s license. Det. Kitchens testified that both the victim and the District Attorney’s office sent | ai ten-day demand letters by certified mail to Mr. Mercadel and that Mr. Mercadel never responded to the District Attorney’s office to this demand. Det. Kitchens’ testimony established that despite Mr. Mer-cadel’s promise to make restitution to Cajun Concrete, he failed to do so. His testimony established probable cause for the charge of issuing a worthless check.
Considering the probable cause hearing testimony, there is no merit to Mr. Merca-del’s argument that defense counsel permitted him to plead guilty to Counts One and Six without a factual basis having been established for his commission of those offenses.
Mr. Mercadel next argues that his counsel’s performance was deficient in failing to object to the habitual offender bill of information which, he claims, set forth two predicate convictions from the same date. The habitual offender bill of information sets forth only one predicate/prior conviction, from 2003. However, Mr. Mercadel was charged as second-felony habitual offender as to the two counts of theft in the amount of $500 or more for which he was found guilty following the judge trial. Mr. Mercadel presumably is mistakenly referring to those two instant/“subsequent” convictions as predicate convictions, and this apparently is the basis of his complaint here.
It is perfectly acceptable for a trial court to adjudicate and sentence a defendant as a habitual offender for more than one conviction obtained on the same date. See State v. Shaw, 2006-2467, p. 20 (La.11/27/07), 969 So.2d 1233, 1245 (“There is no statutory bar to applying the habitual offender law in sentencing for more than one conviction obtained on the same date, whether the convictions result from separate felonies committed at separate times or arise out of a single criminal act or episode.”) Moreover, the habitual offender hearing transcript and minute | gentry from that date reflect that the trial court apparently found Mr. Mercadel a habitual offender only as to Count Two. There is no merit to this claim that counsel’s performance was deficient with regard to the habitual offender bill of information.
*886 Finally, Mr. Mercadel makes a confusing assertion that his trial counsel was deficient in failing to inform him of discussions held at bench conferences and rulings made during them, “on opening motion, [sic] that was to be determined at trial, on value [sic], or agreement with [sic] trial judge and prosecution surrounding the six years [sic] deal, that the judge had threatened Appellant of [sic] changing his mind.” Mr. Mercadel fails to show any deficient representation by defense counsel with regard to this assertion.
There is no merit to any of Mr. Merca-del’s claims of ineffective assistance of counsel.
CONCLUSION
For the foregoing reasons, we grant appellate counsel’s motion to withdraw and affirm Mr. Mercadel’s convictions and sentences.
AFFIRMED; MOTION TO WITHDRAW GRANTED

. Mr. Mercadel said he unsuccessfully attempted to obtain money from Brad Pitt and Angelina Jolie, who were financing a number of homes in the Lower Ninth Ward of New Orleans.

. See 10 La. Civ. L. Treatise, Successions And Donations § 2:3 (2d ed.).